

FILED
MAR 31 2000
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ENTERED
APR 3 2000

| | |
|---|---|
| REGINALD BRYANT, PATRICK PLEASANT and JAMES KIMBROUGH,     ) ) ) | |
| Plaintiffs,     ) ) | |
| ELIGAH MILLER and DAN JEMISON,     ) ) | Civil Action Number |
| Plaintiff-Intervenors,     ) )  vs.    ) ) | 93-C-2541-S |
| OVERNITE TRANSPORTATION COMPANY,     ) ) ) ) | |
| Defendant.     ) | |

### MEMORANDUM OPINION ON CLAIMS OF REGINALD BRYANT, JAMES KIMBROUGH, AND ELIGAH MILLER

In this action under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and 42 U.S.C. § 1981, Plaintiffs Reginald Bryant, James Kimbrough, Eligah Miller, Patrick Pleasant and intervenor Dan Jemison[1] variously claim that they were subjected to a hostile work environment, demoted, retaliated against and discharged by Defendant Overnite Transportation Company ("Overnite") because of their race. Based on the Agreed Facts and the evidence adduced at trial, the Court finds that the remaining plaintiffs have carried their burden of proof. The

---

[1] Plaintiff Patrick Pleasant and Plaintiff-intervenor Dan Jemison have settled by mediation their cases against defendant.

1

appropriate judgment will be entered.

### Racially Hostile Work Environment Claim

Overnite operates a terminal in Birmingham, Alabama, at which black and white workers are employed. The work environment is permeated with racial epithets, jokes, insults, and other demeaning behavior. The following examples are illustrative, not exhaustive.

Racial graffiti, swastikas, and Ku Klux Klan signs were painted on stalls of the restrooms of the Birmingham Terminal. "KKK Rules" and the swastikas were not removed for over a year. Indeed, one such item was on the walls within a few months of the trial of this case. In preparing for trial, Overnight's lawyers interviewed Alfred McLish, a black employee. He testified credibly that

> [defense counsel come in and asked me, uh, did I know Reginald, Pat, Eli and James? And I said, "Yeah." He told me they had a case against Overnite for racial discrimination. Did I know that I had been called as a witness? And I said, "No, not at that time I didn't. Then he asked me had I heard any racial slurs from supervisors? And I told him, "Yeah." And he asked me did I think racial discrimination was going on at that terminal. And I said, "Well, I can show you better than I can tell you." . . . He asked me what did I mean? I said, Well they have Rodney Green hanging from a tree on the bathroom wall . . . I took him and showed him.

Tr. III, pp. 548, 549. McLish's reference was to a drawing depicting a black man hanging from a tree with "KKK" reflected in the top of the tree.

The word, "nigger" is regularly used by James Guinn, a white supervisor, when referring to the black workers. Guinn has made the following statements in the workplace: "You black son of a bitch, you think you're smart!" "You're (referring to a black worker) the cause of this damn mess. You niggers just want to take over." "Go down there and tell that nigger he can go." "I can't tell that damn nigger to do a damn thing."

2

The Operations Manager, James L. Hill, is racially prejudiced. His use of the word "nigger" is unsparing - e.g., "Where's that nigger? I'll work the dog shit out of him!" In February 1994, Hill witnessed a white hourly worker, Moody, as he displayed to Kimbrough a card which read, "KKK - Somebody's Watching You." Hill took no action against Moody. Kimbrough later reported the incident to James Brady, the Terminal Manager. Brady's promise to "look into it" was the end of the matter.

Racial jokes by white hourly workers and supervisors, ofttimes directed at or in the presence of black workers, are commonplace at the Overnite Terminal. When Plaintiff Miller was hired by Overnite, Plant Manager Don Elliott dubbed him, "Lightning," a racially offensive reference to a character from the "Amos and Andy"shows of the fifties. Elliott continued to use that name for Miller on a daily basis for the ensuing eight and three-quarter years. Tr. 72.

Unremarkably, the racist statements and conduct of Overnite's supervisors are manifest in their employment decisions. Put simply, the white workers are given preferential treatment by the white supervisors. Black workers are assigned the heavier and more dangerous (e.g., poisonous chemicals) loads and given the less desirable shift assignments. They are denied the use of their seniority when competing with their white counterparts.

Plaintiffs have abundantly proved the existence of a racially hostile work environment which adversely affected the terms and conditions of their employment.

<u>Reginald Bryant's Claims</u>
1. Demotion

In February 1990, Bryant was hired as a part-time dock worker by the Birmingham

3

Overnite Terminal. In July 1991, he was promoted to full-time dock worker and remained in this position until he was demoted to part-time status by James Hill in January 1993. Bryant was informed that he was being demoted to part-time status because he did not possess a Commercial Drivers License ("CDL"). At the time Bryant was demoted, Defendant did not require dock workers to possess a CDL.

In January 1993, the Birmingham Overnite Terminal was instructed by its corporate management to reduce its payroll-to-revenue ratio. Overnite's reduction-in-force policy at the time stated:

> **Workforce Reduction Policy**
> **Policy:** The Company may be required to reduce its hourly workforce. This is to be done according to Company Seniority
> **Procedure:** (1) Part-time employees are to be reduced before full-time employees.
> (2) Full-time workforce reduction is to be based on Company Seniority.
> (a) Employee with the least Company Seniority in the affected classification will be first to be reduced.
> (b) Employee being reduced is to be offered employment in another job classification where the employee has greater Company Seniority than other employees in that classification, provided that the employee is immediately qualified.

PX 15.

At the time of the January 1993 reduction-in-force, the five full-time dock workers with the least company seniority were Reginald Bryant, James Kimbrough, Donell Garrett, Steve Jackson, and Marion Collins. Of these, Garrett and Jackson are white. Bryant, Kimbrough, Garrett, and Jackson were reclassified from full-time to part-time. Collins, who had less company seniority, but possessed a CDL, was retained as a full-time employee.

4

A dock worker with a CDL is more valuable to Overnite than one without a CDL because he can assume truckdriver duties. Thus, Overnite's use of the CDL criterion for determining whom to demote was race-neutral.

But the reduction-in-force policy requires part-time employees to be reduced before full-time employees. A. Carter, James Sims, and John Tucker, who were white part-time dock workers with less seniority that Bryant and Kimbrough, were not terminated during the January reduction-in-force. PX 93, 108. In fact, A. Carter resigned for voluntary reasons in October 1993 and John Tucker left in March 1993 to accept full-time work. PX 93, 108 and DX 241. Overnite's Plant Manager Don Elliot admitted at trial that under the policy, Carter should have been terminated in January.

The otherwise unexplained failure of Overnite to follow its own policy, is attributable to racial considerations. Accordingly, the Court concludes that Plaintiff Bryant has carried his burden of proof on his demotion claim.

### 2. The Retaliation/Discharge Claim

Following his demotion, Bryant filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 10, 1993. Overnite received a copy of Bryant's charge on April 9, 1993.

Bryant was discharged from his employment on May 28, 1993, ostensibly for insubordination and failure to follow a supervisor's instruction.

During the workshift of May 27, Bryant was approached by James Guinn. Guinn said to him: " Well, Greg's about caught up. I'm going to get Steve Jackson to help on one of the skids. I want you to go over there and help Donnell. I'm not picking on you." Tr. 250. Bryant

responded: "James, if you're not, why would you say that?" Guinn then reiterated his previous negative statement; and Bryant repeated his previous question. Guinn replied, "Well, I'll tell you what, you just go home. Uh, just go home and come and talk to James Hill in the morning." Bryant then left the premises. At the time he left, he had not refused to obey any order given by Guinn. He was terminated on May 28 by James Hill.

The only reason articulated by Overnight for Bryant's discharge is insubordination and failure to obey the orders of a supervisor.

The Court discredits the testimony of Guinn to the extent that it conflicts with Bryant's testimony. Guinn testified at trial that he thrice asked Bryant to help Donell and Bryant refused each time. In his view, "Well, if you asked Reginald to do something, uh, it seemed to go against him. I mean, **he felt like that you was picking on him** or at least that's – that's what I took it to be". Tr. 473 (emphasis added).

James Hill made the decision to discharge Bryant.

White employees have refused to obey direct orders of their supervisors, cursed their supervisors, and refused job assignments without being terminated. Tr. at 247.

The Court finds and concludes that Bryant was discharged because of his race and because of his having filed an EEOC charge against Overnite.

As of the date of trial, Bryant had suffered a loss of $34,327.64 in backpay and prejudgment interest. He is entitled to additional prejudgment interest (at the rate of 9%) in the amount of $15, 447.44.

6

### James Kimbrough's Claim

In June 1990, James Kimbrough was hired as a part-time dock worker by Overnite. In July 1991, he was promoted to full-time dock worker and remained in this position until he was demoted to part-time in January 1993.

Incorporating by reference the operative facts as found by the Court on the Plaintiff Bryant's demotion claim, the Court finds and concludes that Plaintiff Kimbrough has carried his burden of proof on the demotion claim.

Kimbrough's retaliation/discharge claim is the subject of a separate lawsuit.

As of the date of trial, Kimbrough had suffered a backpay loss $20,399.94 attributable to his demotion claim. He is entitled to additional prejudgment interest (at the rate of 9%) in the amount of $ 9,179.97.

### Eligah Miller's Claim

Plaintiff-intervenor Eligah Miller was employed by Overnite since 1985. Overnight concedes that during his roughly nine years of employment, he never failed to report to his regularly assigned shift. He was never reprimanded for inadequate job performance. Miller's racially-biased supervisor, James Guinn, admits that Miller was a good employee, at least until he began associating with Ronald Bryant and James Kimbrough.

Miller worked the split shift Monday, Tuesday, Wednesday, Thursday, and Friday of the first full week of April 1994. Having worked 53 hours that week, he had made weekend plans to be with his family. Near the end of the second segment of Miller's evening shift on Friday, April 8, Guinn approached him and said, "Eli, we will be working tomorrow." Tr. 89. Miller then tried to

7

tell him that he made other plans for the day, but Guin interrupted him. Guin then said, "So," and walked away. Tr. 91. Guin never told Miller that the April 9 assignment was mandatory.

Miller did not report to work on April 9.

When Miller reported to work at his regularly-assigned shift on the following Monday, he was brought to the office. Asked about his failure to work on April 9, he explained that he had not been told that the shift was mandatory. Miller was then sent home and told that the matter would be investigated. Two days later, he was fired.

Overnite challenged Miller's entitlement to unemployment compensation benefits on the grounds that his discharge was based on misconduct committed in connection with work. *See* ALA. CODE § 25-4-78 (3) (c) (1975). The Unemployment Compensation Agency of the Alabama Department of Industrial Relations found the following facts:

> Near the end of the claimant' shift on April 8, 1994, which was a night shift, he was told to report to work the following day at 1:00 p.m. by the dock foreman. The claimant had already made family plans for his off day. Before the claimant could state he would or would not report, the dock foreman walked off. The claimant had only had time to indicate he had plans that day. The claimant did not report for work for that reason and the fact that they had given him short notice to work his day off. Other employees who reported to work for the next shift *were not told* to report to work but *were asked to report to work. Those that did not report to work were not terminated.*

PX 41 (emphasis added). Apparently, Overnite did not argue to the agency that the April 9 assignment was mandatory.

Overnite has articulated that in discharging Miller, it was simply following its unwritten but ironclad "No-call-No show" policy uniformly applied to all employees. According to Overnite, there are "no exceptions" to that policy; it is an "absolute rule." If an employee "[doesn't] show up or . . . call, automatically that person is terminated." Tr. 365.

8

The irrefutable evidence shows otherwise.

White employee Steve Jackson failed to show or call in March 1992 and again in December of that year. PX 37, 38. Plant Manager Don Elliot testified that under the automatic rule, Jackson should have been terminated. Tr. at 367. He was not terminated on either of these occasions; it was not until his third no show/no call offenses in November 1993 that Jackson was finally terminated. DX 182.

Darren Gardner, a white dockworker, failed to show up or call for two shifts prior to his termination for violating the policy. PX 111.

Even assuming that Guinn unequivocally told Miller that he had to work on April 9, the direction would have been racially discriminatory. For there is no evidence that any white employee was ever required to work for a sixth day after completing five consecutive days of work and accumulating over fifty hours.

Based on all of the facts, the Court comfortably concludes that Miller's race was the reason for his discharge.

Miller had suffered a loss of backpay and prejudgment interest in the amount of $32, 504.05 as of the date of trial. He is entitled to additional prejudgment interest (at the rate of 9%) of $14, 626.82.

## Conclusion

Plaintiffs have carried their burden of proof. The court will grant the appropriate relief.

Done this **3/31** day of March 2000.

_____
UNITED STATES DISTRICT JUDGE
U.W. CLEMON